The PEOPLE of the State of
Colorado, Complainant,

v.

James S. BERTAGNOLLI,
Attorney–Respondent.

No. 93SA120.

Supreme Court of Colorado,
En Banc.

Nov. 1, 1993.

Linda Donnelly, Disciplinary Counsel, Kenneth B. Pennywell, Asst. Disciplinary Counsel, Denver, for complainant.

John Patrick Michael Murphy, Colorado Springs, Michael D. Gross, Colorado Springs, for attorney-respondent.

PER CURIAM.

A hearing board in this attorney discipline proceeding found that the respondent[1] violated the Code of Professional Re-

sponsibility and recommended that he receive a letter of admonition and be assessed costs. A hearing panel of the Supreme Court Grievance Committee approved the findings, but modified the recommendation of discipline to a private censure. The respondent has excepted to the panel's action on the grounds that no ethical violation was demonstrated as a matter of law or as a matter of fact, and that even if there was a violation, no sanction is warranted.

The assistant disciplinary counsel, on the other hand, asserts that a private sanction is unduly lenient under the circumstances here. We agree with the latter view and order that the respondent be publicly censured and bear the costs of the proceeding.

## I

The hearing board was presented with the testimony of witnesses for complainant and for the respondent. The respondent himself testified, and certain exhibits were admitted into evidence, including a "Stipulation of Fact" entered into between the parties. The board concluded that the following facts, most of which were set forth in the stipulation, were established by clear and convincing evidence.

The respondent represented a child in arbitration proceedings arising from an automobile accident. The arbitration proceedings were conducted pursuant to a provision of the child's parent's uninsured motorist insurance policy. The child, who was sixteen years old at the time of the accident, sustained brain damage. One of the manifestations of the brain damage was anosmia, which is a loss of, or interference with, the sense of smell.

One of the respondent's witnesses at the arbitration proceedings was Arthur C. Roberts, M.D., a psychiatrist. Dr. Roberts testified on July 8, 1991, that he believed that the child had total anosmia. One week later, on July 15, 1991, Dr. Roberts sent a letter to the respondent which stated:

---

1. The respondent was admitted to the bar of this court on April 16, 1969, is registered as an attorney upon this court's official records, and is subject to the jurisdiction of this court and its grievance committee in these proceedings. C.R.C.P. 241.1(b).

Last week, on July 8, 1991, I testified regarding my clinical conclusions that [the child] had suffered frontal lobe damage as a result of her automobile accident.

In part, I based my findings on the presence of anosmia. On one occasion, early in her treatment course, I thought she had sustained total anosmia on one side and in retesting more recently with a much more sensitive instrument I concluded that she continued to suffer from anosmia.

However, I am sorry to say that I have misinterpreted the results. Based on this test, it seems to indicate that she does not have anosmia.

Of course, I need to protect my reputation for accuracy and so I am letting you know. Incidentally, I still do feel that [the child] suffered frontal lobe damage, which persists, and which has resulted in behavioral changes.

I would appreciate a reply acknowledging that you have received this letter.

On July 24, 1991, Dr. Roberts again wrote to the respondent, expressing his concerns regarding his testimony:

I have not heard from you, in response to my letter of regarding [sic] [the child].

I really find myself in an ethical dilemma regarding this case. As you know, I depend upon my credibility and I would not want to have any decision made in this case or any other based upon erroneous evidence.

I again ask you to please let me know what should be done in this case, as soon as possible.

Dr. Roberts also attempted to contact the respondent by phone on one or two occasions, but the respondent did not call Dr. Roberts until August 2, 1991, when the doctor was out of town.

The arbitration hearing was conducted intermittently for approximately sixty days. In addition to Dr. Roberts's testimony, the arbitrators were presented with other evidence that the child suffered from anosmia, including the testimony of the child and her parents and that of an independent medical examiner.

At the time that Dr. Roberts sent his first letter to the respondent, both parties had completed the presentation of evidence. Closing arguments would not take place, however, until July 30, 1991, after Dr. Roberts's second letter was sent. During closing argument, the respondent argued that anosmia was one of the major elements of his client's damages and he specifically or implicitly referred to the testimony of Dr. Roberts. At no time did the respondent advise the arbitrators, or opposing counsel for the insurer, that Dr. Roberts had notified the respondent that he believed his testimony was in error.

On August 2, 1991, Dr. Roberts contacted one of the three arbitrators, and expressed his concern about his erroneous testimony. The arbitrator sent the respondent a letter dated August 7, 1991, describing the substance of his conversation with the doctor:

As you know, we completed the ... presentation of evidence and arguments on July 31, 1991. On August 2nd I received a call from Dr. Arthur Roberts expressing concern about the issue of anosmia. Dr. Roberts informed me that after testifying at the arbitration that [the child] was suffering from anosmia he returned to his office and reviewed his data and found that there was no objective test data to support that finding. He informed me that he had been in error.

Dr. Roberts advised that he called your offices more than once and wrote you at least one letter telling you of the problem and that you initially did not respond and then left a message that it was taken care of.

I recall you specifically arguing at the end of the arbitration that she was suffering from anosmia and listed that as one of your elements of damages. It appears that you made this presentation with the knowledge of Dr. Robert's [sic] change of testimony and that you let Dr. Robert's [sic] testimony stand knowing that he wished to change it.

Before deciding what to do with Dr. Robert's [sic] report, I thought it would be appropriate to allow you the opportunity to respond to his statements, if you wish. You should also be aware but for the removal of anosmia as an element of damages that this will not affect the arbitrators' deliberation of your client's damages.

In his reply to the arbitrator's letter on August 22, 1991, the respondent admitted that he knew about the issue that Dr. Roberts had raised regarding the presence of anosmia, and he summarized the other evidence indicating that the child had suffered total anosmia. The respondent's letter concluded:

> It would be greatly prejudicial to [the child] to remove the anosmia as an element of damages, as suggested in your letter, since this is a significant element of her damages and is supported by the evidence. I do not know why Dr. Roberts decided after his testimony to review his testing and change his mind. However, since the panel is the finder of fact in this case, his unsolicited phone call to you would be analogous to an expert witness contacting a juror directly.
>
> Since this is such an unusual situation, I will follow any further directions from the panel. However, this matter would never have come up had the arbitration hearing not been extended more than 60 days. In a trial situation, a verdict would have been rendered and the matter would have been moot.
>
> My understanding is that Dr. Roberts' test data was unreliable, not that [the child] does not suffer from anosmia.
>
> Please advise is [sic] you desire any further clarification.

The hearing board determined that the final award to the child was not affected by the respondent's withholding of Dr. Roberts's concerns regarding anosmia, and the arbitration panel was able to consider Dr. Roberts's change of testimony.

The board also found that the respondent realized he faced a dilemma in that he had some obligation to reveal Dr. Roberts's change in position to the arbitrators, but that to do so might hurt his client's case. He therefore sought guidance from a colleague. The other lawyer understood, incorrectly, that the arbitration proceeding had ended, and advised the respondent to say nothing about Dr. Roberts's concerns. The respondent chose to accept the colleague's assessment of his duty because it apparently did not conflict with his own assessment.

## II

Two of the three members of the board concluded that the gravamen of the respondent's misconduct was his explicit or implicit reference to Dr. Roberts's testimony in his closing argument to the arbitrators. All three board members agreed that by referring to Dr. Roberts's testimony in closing, the respondent knowingly made a false statement of fact to the arbitrators, contrary to DR 7–102(A)(5) (in representing a client, a lawyer shall not knowingly make a false statement of law or fact); as well as DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and DR 1–102(A)(5) (a lawyer shall not engage in conduct prejudicial to the administration of justice).[2]

## III

The hearing panel approved the board's findings of fact and conclusions, but modified the board's recommendation of a letter of admonition to a private censure. The assistant disciplinary counsel asserts that private discipline is too lenient under the facts of this case. The respondent has also

---

**2.** The third board member would have found that the respondent also violated DR 7–102(A)(4) (in representing a client, a lawyer shall not knowingly use perjured testimony or false evidence. The board majority concluded that there was no violation of DR 7–102(A)(4) because it was undisputed that Dr. Roberts's testimony was based on a mistake and was not intentionally misleading, and therefore did not constitute "false evidence." The assistant disciplinary counsel has not challenged the majority's conclusion here and we do not reach the issue of whether the respondent's conduct also violated DR 7–102(A)(4).

excepted to the panel's action on three grounds: (1) there was no evidence whatsoever to support the hearing board's determination that the respondent made an inappropriate reference to Dr. Roberts's mistaken testimony; (2) the respondent was under no duty to disclose a mistake in Dr. Roberts's testimony during argument where he learned of the mistake after the close of the evidence; and (3) even if a duty of disclosure did exist, no punishment is warranted under the circumstances here. We initially address the respondent's two substantive contentions.

### A

The respondent first asserts that "[t]here was no evidence, of any kind, in the record to support a finding that respondent made a 'specific or implicit' reference to Dr. Roberts' testimony on the issue of anosmia during final argument." We disagree.

■ A "Stipulation of Fact" was introduced into evidence at the hearing. The stipulation was signed by the respondent, the respondent's lawyer, and the assistant disciplinary counsel. Paragraph 12 of the stipulation states that "[d]uring closing argument respondent argued that anosmia was one of the major elements of damage and either specifically or impliedly referred to the testimony of Dr. Roberts." A stipulation is a form of judicial admission. *Northwestern Nat'l Casualty Co. v. State Div. of Ins.*, 682 P.2d 486, 489 (Colo.App. 1983).

> A judicial admission is a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute. Judicial admissions are conclusive on the party making them, and generally continue to have effect for a subsequent part of the same proceedings.

*Kempter v. Hurd*, 713 P.2d 1274, 1279 (Colo.1986) (authorities omitted). Paragraph 12 of the "Stipulation of Fact" therefore supports the hearing board's finding that during closing argument before the arbitrators, the respondent "argued that anosmia was one of the major elements of damage and he specifically or implicitly referred to the testimony of Dr. Roberts."

### B

■ The respondent next argues that he was under no duty to disclose Dr. Roberts's desire to change his testimony on the issue of anosmia to either the arbitrators or opposing counsel, especially in light of the fact that there was other, independent, evidence that the child did in fact suffer from total anosmia.

However, the hearing board did not reach the question of whether the respondent was under an affirmative duty to disclose Dr. Roberts's belief that his testimony was mistaken. The board only held that the respondent's reference to Dr. Roberts's inaccurate testimony during closing arguments without also informing them of the doctor's present wish to correct his error was deliberately misleading. We agree with the board that the respondent's conduct during closing argument constituted a false statement to the arbitrators in violation of DR 7–102(A)(5) and DR 1–102(A)(4), as well as DR 1–102(A)(5).

### IV

The respondent also contends that, even if his conduct did violate the Code of Professional Responsibility, no sanction is warranted because he was faced with an ethical dilemma with no clear way out. We disagree. Even assuming for the sake of argument that it was a close question whether the respondent was under a duty to reveal Dr. Roberts's change of mind to the arbitrators or opposing counsel,[3] when

---

**3.** As noted above, the hearing board did not reach this issue, nor do we. After the respondent's conduct in this case, we adopted the Colorado Rules of Professional Conduct, effective January 1, 1993. R.P.C. 3.3(a)(4) states that "[a] lawyer shall not knowingly ... offer evidence that the lawyer knows to be false. *If a lawyer has offered material evidence and later learns that the evidence is false, the lawyer shall take reasonable remedial measures.*" (Emphasis added.) Moreover, "[t]he duties stated in paragraph (a) continue to the conclusion of the

the respondent referred to Dr. Roberts's testimony in support of his client's claim for damages, he engaged in independent affirmative conduct that tended to mislead the arbitrators and opposing counsel. The hearing board characterized the respondent's conduct in closing argument as "knowing" and we agree that the evidence supports that conclusion.

Under the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) (*ABA Standards*), in the absence of aggravating or mitigating factors:

> Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

*ABA Standards* 6.12. On the other hand, public censure

> is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

*Id.* at 6.13. A private censure is reserved for occasions "when a lawyer engages in an isolated instance of neglect in ... failing to disclose material information upon learning of its falsity, and ... causes little or no adverse or potentially adverse effect on the legal proceeding." No one of these standards precisely fits the facts and ethical violation in this case.

In mitigation, the hearing board found that the respondent (1) has not previously been disciplined, *id.* at 9.32(a); has made

proceeding, and apply even if compliance requires disclosure of information protected by Rule 1.6 [concerning confidential information]."

full and free disclosure to the board and has evidenced a cooperative attitude toward the proceedings, *id.* at 9.32(e); and (3) there was evidence in the record of the respondent's good character and reputation, *id.* at 9.32(g). The board found only one factor in aggravation, that the respondent has substantial experience in the practice of law. *Id.* at 9.22(i).

After reviewing the record, we agree with the assistant disciplinary counsel that a private sanction would be unduly lenient:

> A private censure, because it does not inform the public about a lawyer's misconduct, "should be used only when the lawyer is negligent, when the ethical violation results in little or no injury to a client, the public, the legal system, or the profession, and when there is little or no likelihood of repetition." ABA Standards 2.6 (commentary).

*People v. Smith,* 769 P.2d 1078, 1080 (Colo. 1989). The respondent's conduct went beyond mere negligence and, although it caused no actual harm because Dr. Roberts himself notified the arbitrators of the error in his testimony, it cannot be said that the potential for harm was negligible. *See People v. Wilder,* 860 P.2d 523, 523 (Colo. 1993) ("The seriousness of the respondent's misconduct, which involved at least a reckless disregard of his obligation not to withhold material information from the fact finder in a legal proceeding, precludes a private sanction."). Accordingly, we reject the hearing panel's recommendation for a private censure in favor of a public censure.

### V

It is hereby ordered that James S. Bertagnolli be publicly censured for his professional misconduct. It is further ordered

R.P.C. 3.3(b). The respondent has not argued that Dr. Roberts's communications to him after testifying were confidential.

that Bertagnolli pay the costs of this proceeding in the amount of $3,041.92 within ninety days after the announcement of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Dominion Plaza, Denver, Colorado 80202.