23CA0235 Peo v Donis 05-08-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0235
El Paso County District Court No. 07CR1477
Honorable Christopher J. Munch, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

David Donis,

Defendant-Appellant.

---

ORDERS AFFIRMED

Division VII
Opinion by JUDGE JOHNSON
Lipinsky and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 8, 2025

---

Philip J. Weiser, Attorney General, Patrick A. Withers, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Adrienne R. Teodorovic, Alternate Defense Counsel, Windsor, Colorado, for
Defendant-Appellant

¶ 1     Defendant, David Donis (Donis), appeals the postconviction court's orders denying his Crim. P. 35(c) motion.  He contends that the court erred by denying his claims of ineffective assistance of his first postconviction counsel because, at the first postconviction hearing, counsel failed to assert that (1) trial counsel's concession of Donis' guilt in counsel's opening statement and trial counsel's unwillingness to pursue an innocence defense constituted structural error; (2) trial counsel failed to ask for a voluntary intoxication jury instruction; and (3) trial counsel failed to impeach a witness regarding misidentification.  He further alleges that his first postconviction counsel's actions constituted cumulative ineffective assistance.  He also contends that his sentence is subject to an abbreviated proportionality review.

¶ 2     We conclude that Donis' first postconviction counsel was not ineffective and, therefore, affirm the postconviction court's order addressing that argument.  We also conclude that Donis is barred from requesting an abbreviated proportionality review and, thus, affirm the order regarding that matter, as well.

1

## I.    Background

¶ 3    A division of this court affirmed Donis' judgment of conviction on direct appeal. *People v. Donis*, (Colo. App. No. 08CA2476, Feb. 3, 2011) (not published pursuant to C.A.R. 35(f)) (*Donis I*).

¶ 4    Donis, who rented the basement apartment in the victim's house, had purchased a truck from the victim. Donis made payments toward the purchase of the truck based on a payment plan. After police suspected that Donis had committed a crime in the apartment, the victim demanded that Donis move out and immediately pay the remaining balance owed for the truck. Donis asked for time to remove his belongings and pay the balance.

¶ 5    One week later, the victim repossessed the truck and called Donis' son to retrieve Donis' possessions, which the victim had placed outside the house. Approximately two weeks later, Donis and a female accomplice drove to the victim's house, broke in, and forced the new tenant to carry several bags of the victim's belongings out of the house.

¶ 6    The victim returned shortly thereafter, and Donis and the woman approached him. Donis and the woman knocked the victim to the ground and assaulted him, and Donis struck the victim with

a pistol. Donis threated to kill the victim if the victim did not return Donis' money or give Donis the truck title. The victim offered to give Donis the title, which the victim said was inside the house. Still armed with the pistol, Donis continued to hit and threaten the victim while the two entered the house. After obtaining the title, Donis demanded that the victim take him to the truck, which was parked at another location. Donis attempted to force the victim into a car, but the victim escaped. Donis and the woman fled in the car.

¶ 7 Donis was convicted by a jury of one count of first degree kidnapping, two counts of second degree kidnapping, two counts of first degree burglary, two counts of aggravated robbery, one count of second degree assault, and one count of felony menacing. He was also found liable for eight counts of violent-crime sentence enhancers. Donis was sentenced to life in the custody of the Department of Corrections without the possibility of parole.

¶ 8 Following *Donis I*, Donis filed his first Crim. P. 35(c) motion in 2014. The court appointed postconviction counsel for him. After a hearing, the court denied all his claims. A division of this court affirmed the court's order. *People v. Donis*, (Colo. App. No.

14CA0031, Apr. 9, 2015) (not published pursuant to C.A.R. 35(f))

(*Donis II*).

¶ 9    In 2015, Donis filed the pro se Rule 35(c) motion at issue in this appeal, claiming his first postconviction counsel had rendered ineffective assistance. The court denied the second Rule 35(c) motion. As relevant to this appeal, a division of this court vacated a portion of the court's denial of Donis' second Rule 35(c) motion. *See People v. Donis*, slip op. at ¶ 19 (Colo. App. No. 16CA0187, Feb. 23, 2017) (not published pursuant to C.A.R. 35(e)) (*Donis III*). The *Donis III* division remanded three claims to the postconviction court:

> (1) [whether] postconviction trial and appellate counsel were ineffective in failing to raise Donis' claim that his trial counsel 'fabricated [his] confession of guilt' in opening statements; (2) [whether] postconviction trial counsel was ineffective by inadequately raising trial counsel's failure to present an alleged misidentification issue to the jury; and (3) [whether] postconviction appellate counsel was ineffective in failing to withdraw previous counsel's opening brief on appeal.

*Id.* *Donis III* instructed the court to provide Donis' postconviction trial counsel with an opportunity to respond to the claims and to conduct further proceedings.

¶ 10    On remand, the court appointed Donis his second postconviction counsel; counsel filed supplements requesting a proportionality review of Donis' sentence.  The district court denied Donis' motion for a proportionality review.

¶ 11    After conducting an evidentiary hearing in November 2022, the postconviction court issued a written order denying Donis' second Rule 35(c) motion.  As part of its order, the court noted that it addressed additional claims that Donis raised in his second Rule 35(c) motion, even though such claims were beyond *Donis III*'s mandate and were likely barred by Crim. P. 35(c)(3)(VI).

## II.    Abandoned Claims

¶ 12    Donis asserted multiple claims in his second Rule 35(c) motion, including whether first postconviction counsel was ineffective by failing to (1) raise the victim's misidentification of Donis' son; (2) raise trial counsel's acquiescence to the judge's proposed jury instruction regarding Donis' facial injuries sustained during trial and trial counsel's failure to move for a longer break in the trial or a mistrial so the jury would not see the injuries; and (3) fully investigate Donis' claims that he was deprived of his right to represent himself, in that she failed to procure a relevant transcript

to support the claim. Donis also asserted that (4) postconviction counsel was unable to effectively prosecute the ineffectiveness claim against direct appeal counsel for failure to procure the same transcript. Because Donis did not assert these claims in his opening brief, they are deemed abandoned, and we do not address them. *See People v. Brooks*, 250 P.3d 771, 772 (Colo. App. 2010).

### III. Ineffective Assistance of Counsel

¶ 13 Donis contends that the postconviction court erred by denying three of his claims of ineffective assistance of first postconviction counsel. We address and reject each contention.

### A. Standard of Review and Applicable Law

¶ 14 Ineffective assistance of counsel claims present a mixed question of law and fact. *People v. Johnson*, 2022 COA 2, ¶ 9. We defer to the postconviction court's findings of fact if they are supported by the record, but we review the court's legal conclusions de novo. *Id.*

¶ 15 In Colorado, there is a "limited statutory right to counsel in post-conviction proceedings." *Silva v. People*, 156 P.3d 1164, 1168 (Colo. 2007). Where the right to counsel exists, counsel must meet

the standard for effectiveness defined in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Silva*, 156 P.3d at 1168-69.

¶ 16     To prevail on an ineffective assistance of counsel claim, a defendant must prove by a preponderance of the evidence that (1) defense counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defendant.  *Strickland*, 466 U.S. at 687; *see also Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003).

¶ 17     To establish deficient performance, a defendant must prove that counsel's performance "fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  To establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694; *see also People v. Washington*, 2014 COA 41, ¶ 23 (stating that a reasonable probability is a "probability sufficient to undermine confidence in the outcome").

¶ 18     The burden is on the defendant to prove both *Strickland* prongs.  *See People v. McDowell*, 219 P.3d 332, 339 (Colo. App. 2009).  Because both prongs must be satisfied, a court may deny a *Strickland* claim by concluding that a defendant has not met one

7

prong without deciding the other. *People v. Garcia*, 815 P.2d 937, 941 (Colo. 1991).

## B. Concession of Guilt and Unwillingness to Pursue Innocence Defense

¶ 19     Donis contends that the postconviction court erred when it determined that his first postconviction counsel's performance was not deficient for not raising trial counsel's (1) concession of Donis' guilt of first degree kidnapping in opening statement and (2) failure to pursue an innocence defense. We discern no error.

### 1. Standard of Review and Applicable Law

¶ 20     A defendant has a Sixth Amendment right to autonomy over deciding his defense, which includes the right to either plead guilty or assert his innocence. *McCoy v. Louisiana*, 584 U.S. 414, 427 (2018). But defense counsel is "captain of the ship" on issues of trial strategy, meaning that counsel may choose how to achieve those objectives presented by the defendant. *People v. Bergerud*, 223 P.3d 686, 693-94 (Colo. 2010); *see also Arko v. People*, 183 P.3d 555, 558 (Colo. 2008).

¶ 21     As part of a defendant's right to enter a plea, defense counsel may not "concede the defendant's guilt to a crime over [the client's]

express objection." *Bergerud*, 223 P.3d at 699. But a concession must rise to the level of a judicial admission before it is deemed a violation of the defendant's rights. *Id.* at 700. "A judicial admission is a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *Id.* (quoting *People v. Bertagnolli*, 861 P.2d 717, 720 (Colo. 1993)). In determining whether a disputed statement made by defense counsel constitutes a judicial admission, the statement should be "read as a whole and understood in light of [its] context." *Id.*

¶ 22 *Strickland* does not apply where a client's autonomy, rather than counsel's competence, is at issue. *McCoy*, 584 U.S. at 426-27. Instead, if a defendant's right to autonomy is violated, the defendant need not prove prejudice. In other words, a defense counsel's violation of the client's right to autonomy constitutes structural error, meaning that, if error is found, the defendant is entitled to automatic reversal. *Id.*

## 2.    Analysis

¶ 23    For Donis to prevail on his concession claim, he must establish that his first postconviction counsel was ineffective by failing to raise this issue at the first postconviction hearing.  In the postconviction context, this means that postconviction counsel did not address a claim that was both meritorious and clearly stronger than those counsel pursued at the postconviction hearing.  *Brown v. Brown*, 847 F.3d 502, 514 (7th Cir. 2017) ("A post-conviction attorney can and should use professional judgment in selecting which claims and issues to raise, just as [courts] expect from attorneys in direct appeals."); *cf. People v. Trujillo*, 169 P.3d 235, 238 (Colo. App. 2007) (applying a "clearly stronger" standard to scrutinizing appellate counsel's issue choice (quoting *Ellis v. Hargett*, 302 F.3d 1182, 1189 (10th Cir. 2002))).

¶ 24    Donis claims that he made clear to his two trial counsel — Marcus Henson (Henson) and Chad Miller (Miller) — that he was innocent of all charges and that he did not commit any of the

charged offenses.[1]  Nonetheless, Donis contends that, without his permission, Henson and Miller adopted a "reasonable man" defense. In addition, Donis argues that, in opening statement, Miller conceded that Donis committed the elements for felony kidnapping. In his opening brief, he included a table comparing Miller's statements with the elements of felony kidnapping on which the court instructed the jury:

| Miller's Statements | Corresponding Element of Class 1 Felony Kidnapping per Jury Instruction 14 . . . |
|---|---|
| 1. "[H]e doesn't hear back [after calling the victim]. So what does [Donis] do? He goes over to [the victim's] residence. . . .  He shows up, and again, he wants his money back, or the car." . . . . | "That the defendant" <br><br> "in the state of Colorado, at or about the date and place charged" |
| 2.  "[A neighbor] will be able to tell [you] that she saw the Cadillac pull up, the Cadillac Explorer [sic], Mr. Donis's car.  She saw it | "That the defendant" <br><br> "in the state of Colorado, at or about the date and place charged" |

---

[1] Marcus Henson and Chad Miller are now judicial officers.  We refer to them by their last names without their titles because their actions in this case were conducted in their capacities as public defenders.

11

| | |
|---|---|
| pull up, and she heard [D.B.] yelling.” . . . . | |
| 3. “The evidence is going to show that this meeting, argument, started in the driveway slash garage of [D.B.’s] house . . . and . . . ended in the driveway slash garage. . . . Now, in between they went inside briefly to get the title of the car. . . . There is your kidnapping evidence.” . . . . | “enticed or persuaded any person to go from one place to another” “with intent to force that person . . . to . . . give up anything of value” “in order to secure the release of the person under the defendant’s actual or apparent control” |
| 4. “The evidence will show you [the victim] has maybe some bruises and some cuts, maybe there was a third-degree assault, a physical altercation.” . . . . | “the person kidnapped suffered bodily injury as a result of the kidnapping” |

¶ 25    The postconviction court concluded that “[t]he trial record and evidence produced at the hearing clearly demonstrated that [t]rial counsel did not admit that the [defendant] was guilty of anything.”[2] Instead, the postconviction court reasoned that Miller made “sarcastic remarks” about the charges — not judicial admissions of

---

[2] Because Miller and Henson are judicial officers in the same judicial district in which Donis was tried, all judges in the Fourth Judicial District recused from presiding over the second postconviction hearing. A senior judge was appointed to preside over this matter.

guilt — and that "there is no realistic chance that a jury would have considered [Miller's] remarks to constitute an admission of guilt." Therefore, the court concluded that first postconviction counsel had not been ineffective by failing to pursue this claim at the first postconviction hearing.

¶ 26    We conclude for four reasons that the record supports the court's findings.

¶ 27    First, when reading Miller's opening statement in context, it is apparent that he made no judicial admission that Donis committed felony kidnapping. Miller stated:

> Good morning. Let's talk about what really happened. This is not about choices and bad decisions and things like that. It's about a Ford Explorer. Okay? It's about a Ford Explorer that [the victim] sold to Mr. Donis.
>
> You will hear not only did Mr. Donis make some payments, he almost fully paid off the Ford Explorer, and he was using the Ford Explorer while he paid it off. Well, [the victim] decides to come over and take that Ford Explorer back. He just comes and takes it.
>
> So what does Mr. Donis do? Well, he calls [the victim], like any of us would do, and says, you give me back my money, or you give me back the car. And if you don't, the big threat: If you don't, I'm going to call the police. Exactly what you would do if you purchased a car from

somebody.  This is about ten days prior to this incident.

*Well, he doesn't hear back.  So what does he do?  He goes over to [the victim's] residence.*  Now this is not the case where some guy creepily shows up at the car dealer's house.  As you heard from the District Attorney, he used to live there, he used to rent a room, so he knows where it is, he knows [the victim] personally.  *He shows up, and again, he wants his money back, or the car.*

Now, you have heard the charges, you have heard what the District Attorneys have decided to charge him with in this case.  You have heard the charge of kidnapping.  Here is what the evidence is going to show about kidnapping*: The evidence is going to show that this meeting, argument, started in the driveway slash garage of [the victim's] house.  And this meeting and argument ended in the driveway slash garage* of [the victim's] house.  *Now, in between they went inside briefly to get the title of the car, okay?  There is your kidnapping evidence.*  Starts and ends right there in the garage, in the driveway.

So the story [the victim] tells, he will get on the stand and he'll tell you, is that they jump out of this car, they attack him.  They hit him too many times to count.  They are hitting him with a gun.

Well, what will the evidence show you?  *The evidence will show you he has maybe some bruises and some cuts, maybe there was a third-degree assault, a physical altercation.*  The evidence will absolutely not support

14

somebody being beaten too many times to count by two individuals with a gun.

Don't take my word for it, you'll see the photos. Also you will look for corroboration. We can go to the neighbors. Okay? You have the neighbors right next door. That's the first place [the victim] runs, bangs on their door, tries to get in. Then you will hear, lays in their yard. He wants this to be dramatic. Well, they don't answer the door, so what does he do?

Then he gets up from their yard, because that hasn't worked, he walks out in the middle of the road, and he lays down there. Now, mind you, this is after Mr. Donis had already left. We'll get back to that in one second. He lies down in the middle of the road and starts shouting. Well, that neighbor didn't work, let's try to wake the whole neighborhood, let's see who does work.

Well, [a neighbor] was outside, out on her back patio, which faces that residence. *She will be able to tell when you she testifies that she saw the Cadillac pull up, the Cadillac Explorer, Mr. Donis' car. She saw it pull up, and she heard [the victim] yelling.* What she won't be able to tell you, what the evidence won't show you, she won't come in here and say that she heard two males fighting. She won't come in here and say that she heard a female at all. She won't even tell you she saw a second male or female. She won't tell you she heard a gunshot. But again, she'll tell you she was out back, and that she was — her back yard faces the front of [the victim's] residence.

Now [the victim] gets in this fight, gets in this argument with Mr. Donis, and then needs to

15

> make this scene, because Mr. Donis already
> told him he was going to call the police,
> because [the victim] stole his car. That's why
> we're here today. That's your story.

(Emphasis added.)

¶ 28    Even on the cold record, Miller made no statement that Donis engaged in any of the conduct charged. Rather, Miller acknowledged that Donis and the victim had a disagreement over the truck; the disagreement took place between the driveway and the garage of the victim's house (i.e., there was no movement from one place to another nor was there any force — the third row of Donis' table); and the victim, at most, suffered bruises or scrapes (i.e., no bodily injury as a result of the alleged kidnapping — the fourth row of Donis' table).

¶ 29    Second, at the November 2022 evidentiary hearing, Miller and Henson testified that they used sarcasm as a trial technique to convince the jury that the prosecution's evidence was "ridiculous" or "garbage." Miller testified that his tone while delivering Donis' opening statement would have suggested to the jury he was being sarcastic and that he used sarcasm as a rhetorical device while trying cases as a public defender. Indeed, he also testified that he

16

"often taught attorneys" in the public defender's office to use sarcasm as part of their array of trial tools.

¶ 30     Third, to the extent there is any question about Miller's tone, the postconviction court asked its own questions about Miller's use of sarcasm. In questioning Miller directly, the court recognized that its tone while asking Miller questions would not come across on the record. But the court and Miller had the following exchange:

> THE COURT: My tone won't make it into the record any better than anybody else's would, but I guess what I'm trying to — I've heard this done in two different ways. One would be that's the kidnapping, in which case it should've ended with a question mark. The other would be that's their kidnapping, which would — would not end in a question mark. Both imply the same thing, which is this isn't what they say it is, and I was trying to determine whether you knew which of those sorts of intonation you probably would've used or whether you would've used those words different.
>
> THE WITNESS: I would say closer to the second one, and I'm basing this on my typical style, right, not necessarily the question. The question can be answered either way. You know? This is your kidnapping? And the jury could decide, well, yeah, it is. And that's not my goal, right? It would be even more sarcastic than your second example, I think. I mean, here's the kidnapping they want you to

17

believe.  This is ridiculous.  This is garbage.
You know, however you want to phrase it.

¶ 31     The court's inquiry as to whether Miller used sarcasm by posing his remarks as a question or as a statement is critical. Miller testified that he did not want to pose questions to the jury but instead would make declarative statements in a sarcastic manner.  He reasoned that making a declarative statement with sarcasm was more powerful because he intended to sway the jury to his client's side — i.e., the prosecution's case was weak or ridiculous — and not allow the jury to think there was another answer to his sarcastic question by agreeing with the prosecution.

¶ 32     Although the postconviction court did not make a specific credibility finding in its order, it impliedly did so by holding that Miller had used sarcasm as part of his opening statement.  *See Dunlap v. People*, 173 P.3d 1054, 1061-62 (Colo. 2007) ("The trial court that presides over a Crim. P. 35(c) hearing is the trier of fact and bears the responsibility of determining the weight and credibility to be given to witness testimony."); *see also People v. Curtis*, 681 P.2d 504, 516 (Colo. 1984) (concluding that a district court "impliedly" discounted the defendant's statements that his

right to testify was voluntarily waived because whether to believe or not believe a witness is "essentially a question of credibility").

¶ 33 Fourth and finally, the postconviction court took into consideration — but rejected — the testimony of Donis' trial expert, Nancy Holton (Holton), that sarcasm should never be used in trial. Holton said, "Don't use sarcasm in a jury trial because people don't know you're being sarcastic. I think it's very difficult for lay people [to] understand that something is being said in a sarcastic tone." Holton further testified, "And so, for example, when . . . Miller made the comments about so [Donis] moved from the garage to the house, that's your kidnap, I mean, I suppose he used tone — intonation that maybe was sarcastic, but some of the jurors might go, oh, that's the kidnap."

¶ 34 But whether counsel's use of sarcasm might be risky because it could backfire is not the standard to prove ineffectiveness; instead, the question is whether counsel's use of sarcasm in this case constituted deficient performance such that first postconviction counsel was deficient by not raising this claim at the first hearing. At the November 2022 hearing, the court recognized this distinction when it asked Holton a follow-up question:

THE COURT: All right.  Next, did your view that sarcasm is always ineffective — I don't mean ineffective in the sense of not persuasive, but I mean ineffective in the sense that it constitutes substandard performance by an attorney to such a degree as to be ineffective assistance of counsel?

THE WITNESS: No.  I think that would be too strong of language to use, your Honor.  But I just don't think it's a great idea to do because it can be so easily misunderstood.  And in this case, I think that the risk of misunderstanding was significant.

¶ 35     Even Holton was unwilling to concede that use of sarcasm by defense counsel constituted deficient performance; she only said it poses too much of a risk that the jury will misunderstand it.  The second postconviction court adopted this viewpoint, reasoning that, "[w]hile [Holton's] view may be generally sound, the use of sarcasm by criminal defense counsel is not particularly unusual and is not constitutionally ineffective."

¶ 36     Miller and Henson also acknowledged that excessive use of sarcasm has pitfalls.  Miller testified that he cautioned the attorneys he trained "to be careful with [sarcasm]" because "if you go too far, the jury might think you're a jerk and not buy anything you have to say."  And Henson conceded that, if he were being

20

"honest," he would "probably say plenty of judges" told him he used sarcasm "too much." But again, using sarcasm too much and using it so that it constitutes deficient performance of counsel are distinct. The former is, at most, a practice that, according to Holton, counsel should use sparingly, while the latter renders counsel's performance constitutionally ineffective.

¶ 37  Nonetheless, Donis asserts that, even assuming Miller used a tone sufficiently conveying sarcasm to the jury, Miller did not comply with Donis' demand for an innocence defense because Miller conceded in his opening statement that Donis (1) was present on the night of the incident; (2) committed one element of kidnapping by transporting the victim from inside the house to the driveway; and (3) committed at least third degree assault (by inflicting the victim's injuries). Although not directly addressed by the second postconviction court's order, we discern no error on these bases as well. *Moody v. People*, 159 P.3d 611, 615 (Colo. 2007) (an appellate court may affirm on any basis supported in the record, even if that basis is different from the grounds on which the district court relied).

¶ 38    First, the victim and the victim's new tenant, David McKinney (McKinney), identified Donis as being present the night of the incident.  The victim and McKinney identified Donis in a six-photograph, out-of-court array lineup and made in-court identifications of him as the person at the victim's house who assaulted the victim.

¶ 39    Donis even suggested that he was present at the house on the night of the incident.  Donis admitted during his police interview with Detective Terry Thrumston (Detective Thrumston) that he went to retrieve his belongings from outside the victim's house that night.  Donis also knew the victim had a bump on his head, which the victim testified he received when Donis hit him with his pistol.  Detective Thrumston testified that, during her interview with him, she had not mentioned to Donis that the victim had a head injury before Donis said the victim might have a bump on his head.  Under these circumstances, where Donis' presence at the scene was undisputed, trial counsel's strategy to acknowledge Donis was present — but to assert that he did not commit any of the charged conduct — was consistent with Donis' desire to assert his innocence.

¶ 40 And even now, Donis never directly disputes or denies that he was present at the victim's house on the night of the incident. When asked by second postconviction counsel how he felt about Miller's opening statement, he testified that he was "puzzled" because "I was hearing him say that I was at a place where something was occurring that I never said anything like that to either him or Marcus Henson or anybody else." He also said that he believed Miller admitted to the jury that Donis was guilty because "[Miller's] telling them it's not as serious as what the prosecution is introducing in her opening statement. But nevertheless, something occurred, but it wasn't that serious so for the jurors to not view it as that serious." In neither instance does Donis dispute he was never at the victim's house the night of the incident; instead, he disagrees with the events Miller stated occurred that night.

¶ 41 Even during Donis' cross-examination at the evidentiary hearing, he did not deny his presence at the victim's house. Donis testified that Miller "states that we [Donis and the victim are] arguing in the driveway; after the argument we go through the house — he makes clear they go through the house to get the title

23

of the vehicle, and there goes your kidnapping evidence, where he's saying it's not as serious as what the prosecution is really relating to you, but these — something happened there." Again, Donis does not contend that Miller erroneously told the jury Donis was present that night; rather, his objections focus on Miller's description of the events that occurred at the victim's house.

¶ 42 Second, Miller testified at the November 2022 hearing that he was trying to convey in his opening statement that the prosecution could not prove that Donis had "enticed or persuaded" the victim "to go from one place to another." Miller said that "kidnapping required some sort of movement, and that time — the case law has changed, right — so some sort of movement, however slight, and that the time increased the danger to the victim." And because he said in the opening statement that there was really no movement of the victim, the evidence would show that Donis could not have committed kidnapping. Henson's closing argument was consistent with the opening statement, as he asserted that the physical evidence presented by the prosecution did not support "this beating [of the victim], moving through a house where three people at least

are involved in some sort of fight. The physical evidence doesn't support that."

¶ 43 Third and finally, Miller did not concede or admit that Donis committed any of the charged conduct. We acknowledge that Miller said to the jury that Donis had, at most, "maybe" committed third degree assault, but we reject this was conceding any guilt because Donis was not charged with that offense. More importantly, Miller again made this statement sarcastically, as the postconviction court found.

¶ 44 Thus, we conclude that trial counsel correctly acted as "captain of the ship" by choosing a "reasonable man" defense strategy. This defense meant acknowledging that Donis was present but that he did not commit any of the charged offenses. Instead, under this theory, Donis was acting reasonably because it was *the victim* who acted *unreasonably* by repossessing the truck when Donis had paid almost the full amount owed. And first postconviction counsel was "captain of the ship" when choosing whether to raise the concession claim in the first postconviction proceedings, knowing that Donis had raised numerous issues and this claim was not "clearly stronger" than others raised. *See*

25

*Trujillo*, 169 P.3d at 238. Thus, the postconviction court did not err by rejecting the claim that Donis' first postconviction counsel was ineffective for not raising the concession/innocence claim.

## C. Voluntary Intoxication

¶ 45 Donis next contends that the postconviction court erred by finding first postconviction counsel did not render ineffective assistance by failing to raise at the first postconviction hearing that trial counsel was ineffective by not (1) seeking to voir dire the jury on drug usage, knowing that Donis and McKinney may have used cocaine on the night of the incident; (2) retaining an expert to discuss how cocaine might affect a person's ability to form specific intent; and (3) asking for a voluntary intoxication jury instruction. We discern no error.

### 1. Applicable Law

¶ 46 Voluntary intoxication is not an affirmative defense completely absolving a defendant of criminal liability; rather, under appropriate circumstances, it negates the specific intent necessary to carry out certain offenses. *See* § 18-1-804(1), C.R.S. 2024 ("[E]vidence of intoxication of the defendant may be offered by the defendant when

it is relevant to negative the existence of a specific intent if such intent is an element of the crime charged.").

¶ 47    A criminal defendant who maintains his innocence may receive an inconsistent jury instruction on voluntary intoxication, provided there is a rational basis for the instruction in the evidentiary record. *Brown v. People*, 239 P.3d 764, 769 (Colo. 2010). But while a district court may "issue an inconsistent jury instruction on a lesser included offense," nothing in the law "compel[s] it to do so." *Id.* Instead, a district court must determine "whether a rational basis for the requested instruction exists in the evidentiary record before granting or denying such instruction." *Id.*

## 2.    Voir Dire on Drug Usage

¶ 48    Donis contends that because his drug usage was likely to come in, trial counsel should have conducted voir dire of the jury on this topic. His main complaint is that his first postconviction counsel and the second postconviction court erred by focusing solely on the evidence involving Donis and McKinney's potential drug use. But Donis also maintains that the drug evidence spanned beyond McKinney and included the introduction of Donis' voicemail he left for the victim referencing drugs the victim had

27

given Donis to sell and testimony about whether Donis and the victim had done drugs together at the victim's house.

¶ 49 We acknowledge that the second postconviction court's analysis on drug usage was limited to whether McKinney would testify at trial. McKinney had spoken with defense investigators and indicated that he and Donis smoked crack cocaine together before the confrontation between Donis and the victim. But defense counsel knew before trial that the prosecution could not locate McKinney. If McKinney did not testify, there would be no testimony about Donis doing drugs on the night of the incident. McKinney was not located until mid-trial, and he testified during the second week of trial. Therefore, the second postconviction court said that it had been a reasonable trial strategy for defense counsel to avoid mentioning drug usage during voir dire because McKinney had not yet been located.

¶ 50 But the drug testimony to which Donis refers — i.e., Donis' reference in a voicemail to the victim that the victim had given Donis drugs to sell and Donis and the victim had done drugs in the house — had come in before McKinney's testimony and did not indicate that Donis did drugs on the night of the incident. It was

only McKinney who testified about Donis smoking crack cocaine the night of the incident.

¶ 51     Therefore, while Miller and Henson testified that they knew that testimony about drugs was likely to be discussed at trial — regardless of whether McKinney testified — the issue for them was whether the testimony would focus on Donis doing drugs the night the altercation with the victim occurred.  With this rationale, we cannot say that trial counsel's failure to voir dire on drug usage constituted deficient performance.  Therefore, the postconviction court did not err by finding that first postconviction counsel's failure to raise this omission did not constitute ineffective assistant.

### 3.     Retention of an Expert

¶ 52     Donis contends that trial counsel was ineffective by failing to retain an expert about how drug usage might impair a person's ability to form specific intent.

¶ 53     Miller acknowledged that bringing up bad facts like drug usage might be a reasonable strategy, but he also testified that it would depend on the circumstances.  For example, Miller said, "[I]f [Donis] used drugs in the past with [the victim], I still don't want [Donis] on drugs that day."  He then said, "Because somebody who's

on cocaine is more likely to do something that [the victim] suggested[,] which is how this case came about[,] [rather] than somebody who is sober and just trying to get their money or their truck back."

¶ 54 Miller further testified that he did not think drug use was always inculpatory, so he "would always want to get ahead of that and get out in front of it." He acknowledged that "if it's definitely coming in that [Donis] was on drugs that day," then he agreed that he might want to raise his client's drug usage head-on, but "if it was some sort of drug use in the past, no, I absolutely would not have wanted to get into that. I'd want him to be sober, clearheaded, and a reasonable businessman."

¶ 55 Holton testified that any time defense counsel knows drug evidence is going to be introduced at trial, defense counsel should find out the jurors' viewpoints in voir dire to assess bias, retain an expert on the effects of cocaine on a defendant's ability to form intent, and ask for the voluntary intoxication instruction. But because trial counsel did not know for sure whether testimony would come in about Donis' drug usage on the night of the incident, we agree with the second postconviction court that first

30

postconviction counsel was not deficient when she focused less on these issues at the first hearing.

### 4. Jury Instruction

¶ 56    Finally, Donis contends that first postconviction counsel was ineffective by failing to raise that trial counsel did not ask for a voluntary intoxication jury instruction.

¶ 57    But *Donis II* already determined that trial counsel was not ineffective for not pursuing a voluntary intoxication defense. That division reasoned that trial counsel had a reasonable strategy to portray Donis as a "reasonable man," and trial counsel had said that "the common perception of someone on cocaine is a wild and crazy person that might go in and pistol whip somebody and drag him around the house," which was inconsistent with this defense.

¶ 58    And even though the prosecution stipulated to Holton's qualifications as an expert or that her testimony was unrebutted is irrelevant to whether trial counsel deficiently performed by failing to request a voluntary intoxication jury instruction. Case law supports that whether to request a specific jury instruction is "within the unique competence of defense counsel," *People v. Villarreal*, 231 P.3d 29, 35 (Colo. App. 2009) (quoting *Arko*, 183

31

P.3d at 559), *aff'd on other grounds*, 2012 CO 64, and that failing to ask for a jury instruction that is inconsistent with the theory of defense does not constitute ineffective assistance of counsel, *id.* (concluding that defense counsel was not ineffective for not asking for a voluntary intoxication instruction when it was inconsistent with the theory of defense); *see also People v. Garner*, 2015 COA 174, ¶¶ 66-67, 69 (not seeking a voluntary intoxication instruction does not overcome the presumption of a "sound trial strategy" when it was inconsistent with the theory of defense); *Pensinger v. Chappell*, 787 F.3d 1014, 1031 (9th Cir. 2015) ("Where counsel pursues one theory of the defense over another, counsel's lack of request for a jury instruction on the alternate theory does not constitute deficient performance."); *Jackson v. Shanks*, 143 F.3d 1313, 1320 (10th Cir. 1998) ("Trial counsel's decision not to present inconsistent defense theories does not constitute ineffective assistance.").

¶ 59     Miller's testimony at the second postconviction hearing is consistent with the case law that, while trial counsel could have pursued a voluntary intoxication defense and asked for a jury instruction, he and co-counsel had a "sound trial strategy" that

they could not "'ride two horses' at trial" because they would be saying to the jury, "He didn't do this, but if he did, he was intoxicated. That does not make any sense." *See Trujillo*, 169 P.3d at 238.

¶ 60 We also fail to see how first postconviction counsel was ineffective by failing to raise this issue further in the first hearing when second postconviction counsel emphasizes Donis' desire to maintain his innocence. Although Miller conceded that a voluntary intoxication instruction could have been an option, we see nothing in the record where Donis agreed that such a defense and instruction would not have been contrary to his assertion of innocence.

¶ 61 Thus, we conclude that the second postconviction court did not err when denying that Donis' first postconviction counsel was ineffective on this claim.

### D. Misidentification of Female Accomplice

¶ 62 Donis contends that the second postconviction court erred by finding first postconviction counsel was not ineffective when she failed to raise trial counsel's deficient performance by not

impeaching McKinney for his misidentification of Donis' alleged female accomplice.

¶ 63    McKinney testified at trial that Donis had a female accomplice with him on the night of the incident.  It is undisputed that the police showed McKinney a photo array and McKinney identified as the female accomplice a woman who was incarcerated at the time of the incident.  As a result, Donis contends that trial counsel had this information yet failed to impeach McKinney about his misidentification.  And according to Donis, because McKinney was a crucial prosecution witness, trial counsel was deficient by not using this impeachment material to attack McKinney's credibility.  The second postconviction court held that, even though trial counsel had no tactical reason for not impeaching McKinney with his misidentification of the female accomplice, the overall cross-examination of McKinney met the "constitutional standard of professional adequacy."

¶ 64    Although not worded as such, we view the postconviction court's conclusion on this issue to be a prejudice, rather than performance, analysis.  "*Strickland* generally requires a showing that the defendant was prejudiced — that is, that there is a

34

reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance." *People v. Sharp*, 2019 COA 133, ¶ 26 (citing *Strickland*, 466 U.S at 687-88).

¶ 65    Even assuming trial counsel's performance was deficient by failing to impeach McKinney on his misidentification, Donis failed to prove prejudice because he cannot show how further undermining McKinney's credibility would have resulted in a different outcome. *See Moody*, 159 P.3d at 615 (we may affirm an order on any ground supported in the record); *see also Sharp*, ¶ 12 (whether a defendant has satisfied *Strickland*'s performance or prejudice prongs are legal conclusions "to which [an appellate court] do[es] not defer").

¶ 66    Miller attacked McKinney's credibility during cross-examination on a variety of topics, including McKinney's relationship with the victim, how much alcohol he consumed the night of the incident, his inability to remember details about Donis and his female accomplice, whether Donis reached around and grabbed a gun from his waistband, and whether McKinney smoked crack the night of the incident.

¶ 67    Miller drew the jury's attention to these inconsistencies and omissions by comparing McKinney's statement to a police officer's

35

trial testimony. And in closing argument, Henson used those inconsistencies in McKinney's testimony to tell the jury that McKinney was "not always a truthful guy."

¶ 68    Accordingly, we conclude that there was no reasonable probability that impeaching McKinney on the misidentification issue would have changed the outcome. *See People v. Dunlap*, 124 P.3d 780, 798 (Colo. App. 2004) (finding failure to impeach witness did not demonstrate a reasonable probability that the additional information would have caused a different outcome). Because Donis has failed to meet his burden of showing both deficient and prejudicial performance, we discern no error.

## E.    Cumulative Error

¶ 69    Because we have discerned no errors in the court's order denying Donis' second Rule 35(c) motion, his claim of cumulative error necessarily fails. *See People v. Villa*, 240 P.3d 343, 359 (Colo. App. 2009) (cumulative error analysis is required only when multiple errors have been identified); *see also People v. Walton*, 167 P.3d 163, 169 (Colo. App. 2007) (defendant cannot be awarded relief based on cumulative error where there are not multiple errors compounded).

## IV. Sentencing

¶ 70    Donis contends that his sentence is subject to an abbreviated proportionality review and, therefore, the postconviction court erred by denying such a review.  We disagree.

¶ 71    The Eighth Amendment protects defendants from sentences that are grossly disproportionate to the crime.  *Wells-Yates v. People*, 2019 CO 90M, ¶ 5.  In that case, our supreme court clarified four points concerning an abbreviated proportionality review: (1) "the court must consider each triggering offense and the predicate offenses together and determine whether, in combination, they are so lacking in gravity or seriousness as to raise an inference that the sentence imposed on that triggering offense is grossly disproportionate"; (2) "in determining the gravity or seriousness of the triggering offense and the predicate offenses, the court should consider any relevant legislative amendments enacted after the dates of those offenses, even if the amendments do not apply retroactively"; (3) not all narcotics offenses are per se grave or serious; and (4) "the narcotic offenses of possession and possession with intent [to distribute] are not per se grave or serious."  *Id.* at ¶ 2.

¶ 72    Recently, in *McDonald v. People*, 2024 CO 75, ¶¶ 16, 22-25, 34, our supreme court held that, while *Wells-Yates* announced some new rules with respect to how district courts should conduct abbreviated proportionality reviews, the rules "are procedural, not substantive," because they "regulate[] only the *manner of determining* the defendant's culpability."  *Id.* at ¶ 28, 34 (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004)).  Because *Wells-Yates* did not announce substantive new rules, its "holdings don't apply retroactively to cases on collateral review."  *Id.* at ¶¶ 16, 34 (noting that "defendants seeking collateral review of their cases after their convictions are final generally aren't entitled to retroactive application of [a] new rule unless the rule" is substantive rather than procedural).

¶ 73    Based on *MacDonald*, Donis is not entitled to retroactive application of *Wells-Yates* and, thus, the postconviction court did not err by denying Donis' request for an abbreviated proportionality review of his sentence.

## V.    Conclusion

¶ 74    We affirm the postconviction court's orders.

JUDGE LIPINSKY and JUDGE MOULTRIE concur.